Next case, Border v. Railroad. All right, fellas. Counselor, you up there? Good morning, Judge Goldenhurst, as well. This is a case that comes before you on Supreme Court Rule 308, Rule of Certification by Judge Goldenhurst. I just certify a few of yours. I understand. That's okay. This case is a very narrow issue, and it arises out of this railroad crossing accident that happened back in November of 2006. And the lawsuit Mr. Keefe has brought on behalf of his clients, there are two claims for wrongful death, and that's what this case is involving. But the narrow issue that is before the court on the certification today is dealing with gates. By way of background, in 1962, the Illinois Commerce Commission entered an order to actually remove gates at this particular crossing. And this order, by the way, is the identical order that was entered in another case that has been decided by the Illinois Supreme Court, which is Chandler v. Illinois Central. And, of course, by way of background, the reason the gates were removed back in 1962, the idea years ago for the installation of gates at railroad grade crossings, that there's a number of criteria, but one of the criteria was the fear of trains crossing at a crossing, and if you have a double track crossing. And so, in other words, a train is coming from the north and one coming from the south. The train from the north clears the crossing, and another train is coming, and somebody isn't aware of that. And that's one of the reasons and criteria that the Illinois Commerce Commission and regulatory bodies imposed gates at double track crossings. And I'm not suggesting to the court that's the only criteria, that was one of the criteria. And what Illinois Central did back in 1962, they were actually eliminating a second track. And so there's a whole series on this set of tracks that the second set was eliminated, and so a petition had been filed to remove the gates at these crossings that previously had gates because of the double track crossing. So where does that take us? That takes us up to the distinction which, of course, there's not any really factual dispute in this case. There's a dispute as to the interpretation of some of those facts, but really what we know is that in 2005, the Illinois Commerce Commission, an administrator, and this is a very important point of the case, is Mr. Michael Steeve, who's an administrator for the rail section of the Illinois Commerce Commission. And he exchanges letters with some constituents, including Jerry Castello, the congressman at the time, with some petitions to change this crossing or upgrade it to gates. And what Mr. Steeve sent an investigator from his office, they went out and looked at it, and he sends correspondence, and it's all correspondence which is part of this record. And he says that this crossing would meet the minimum requirements for installations of gates at the crossing. And then he places this crossing on a program to install gates in the year, I think, 2009, 2010, several years later. And as you can see in the documents in the file, this was never presented to the commission. And the reason why this is important is everything when the plaintiff is arguing these various regulations, and they talk about whether or not an order is required or approval is required, Mr. Steeve, which he actually testified and his testimony is recited, is not the Illinois Commerce Commission. The Illinois Commerce Commission is actually people that are appointed by the governor, and as all the regulatory provisions clearly provide, and if you look at every provision that's cited by the plaintiff or by the defendant in this case, over and over it says the commission, the commission, the commission. There's nothing in there that says that Michael Steeve, an administrator, has the authority to order or change any of the warning devices at the crossing. So, of course, this is very similar on the Chandler case. This same issue was raised, actually, in Chandler. The plaintiff tried to distinguish because of the fact that gates had been at the crossing in 1962, and they removed, and so that this preemptive statute from the state of Illinois didn't apply, and the Illinois Supreme Court rejected it. The mere fact that if the gates have, excuse me, the crossing devices have been approved, then they're deemed adequate and appropriate. Now, what the plaintiff is attempting to argue here is that because Mr. Steeve wrote these letters and indicated that this crossing was going to be placed on a program to install gates in 2009, and that Mr. Steeve indicated it met the minimum qualifications for the installation of gates at the crossing, that that changes something, and it doesn't. And that's as clear as it can get, and every provision of the statute that's been adopted by Illinois makes it clear that that's not the requirement. The requirement is, and if you think of it, really, the reason why these decisions have to be made by the Illinois Commerce Commission, it goes back to law that was actually passed by Congress back in the 1970s, where they, what they did is they actually provided funding, saying, you know, we have trains operating in multiple states. We have states and some states having different types of warning devices, and some states having different warning devices. We need uniformity, and basically, this is a highway traffic problem. In other words, when we're dealing with gates or lights or signs at railroad grade crossings, it's not for the purpose of regulating the railroad. It's for the regulation of highway traffic, and so back in the 70s, the federal government required every state to select an agency to regulate the railroad grade crossings in their states, the public railroad grade crossings within the state, and Illinois selected the Illinois Commerce Commission. And so it's the Illinois Commerce Commission in the state of Illinois that makes those decisions. Thereafter, and another federal regulation, which is actually, it's not a regulation, but it's the Manual of Uniform Traffic Control Devices, which has been adopted by most of the states, including the state of Illinois, and the version that was in effect at the time of this accident was the 2003 version. And if you look at what the language clearly says, it's that it's the responsibility of the state agency and the local highway authority to make the determination as to what type of signs or warning devices are to be placed at a cross. As a matter of fact, in the 2000, there was a 2000 Millennium version of that same version of the Manual of Uniform Traffic Control Devices, and the word railroad was dropped out. And some commenters came in and they actually said to the Federal Railroad Administration and the Federal Highway Administration, they said, look, the railroad has dropped out of this. And they said, well, the way we look at this, the railroad has no responsibility for the selection of warning devices at highway railroad crossings. This is the responsibility of the state. Where the railroad has responsibility is when once a decision has been made by the state agency, in this case, it would be the Illinois Commerce Commission. Once the Illinois Commerce Commission orders that some change be made at that crossing, whether it's placing in lights at the crossing, this crossing already had lights, but whether it be putting stop signs at a crossing or putting yield signs at a crossing or putting in, in this case, the gates, it's incumbent upon the Commerce Commission to enter an order. Then when the Commerce Commission enters that order, they allocate time for the railroad to actually complete the work. And then the railroad's responsibility is obviously to comply with the Commerce Commission's regulations and orders, and then they maintain those devices that are ordered by the Commerce Commission. If it's a crosswalk only crossing where there's just crosswalks, it's their responsibility to maintain those signs. If flashing lights aren't there, then it's their responsibility to maintain those devices, whether it's gates, lights, or simply signs. It's to maintain those devices. But they do not have any involvement or responsibility legally to do anything as far as the selection and determination of what types of devices are required at the crossing. Actually, in December of 2005, and we've cited this in our brief, I guess in order to actually articulate this again, the Illinois legislature, they passed under the administrative provision 92LADM 1535.20. They actually articulate that all lawfully existing crossings and installations of crossing warning devices are hereby approved, subject, however, to the right of the commission by appropriate proceedings to require changes or improvements at any particular crossing or crossings at any time. And that did not happen in this case. It didn't happen in this case before the unfortunate accident that happened in November of 2006. And as the record establishes, after this unfortunate accident that happened in November of 2006, Mr. Steeve decided and he communicated with Congressman Castello that, okay, we're going to accelerate our plan and we're going to put this together. And he even said, in order to submit it to the commission for the commission's order. And that's what's required. It still has to be submitted to the commission and the commission's order. It's not Mr. Steeve's determination or anyone else's determination. It's ultimately that you wait until the commission has entered the order and those statutes and the laws make it very clear that nobody can alter or change the warning devices at a railroad grade crossing in the state of Illinois without first order by the Congress Commission. And that's really the crux of this entire, these two issues that are presented to you for pursuance of the certification. The plaintiff makes an argument that even though they acknowledge that these laws aren't effective, the plaintiff makes the argument that somehow because the railroad was aware of the fact that Mr. Steeve had written these letters that it was incumbent upon them to petition the Congress Commission to install gates at this crossing. And of course the Danner case, which we've cited in the record, clearly rejects it. There is no duty on the responsibility of a railroad to petition the Congress Commission to make any alterations or changes at a railroad crossing, just like it's not the responsibility of any citizen of the state of Illinois to make such a petition. So the bottom line is, what we have here, the first question is whether or not this letter, this letter somehow alters the preemptive effect of the statutory provision that says that the flashing lights that were in existence at the crossing at the time of this accident, whether that somehow changed things. And it doesn't. It doesn't change anything whatsoever. And then the second question as far as the, whether the railroad had a duty to petition or do something other than that, equally, there is no such responsibility. So I'm not suggesting to the court that the railroad has no responsibility to a railroad crossing, as I indicated. Once the commission has entered some order, it's the railroad's responsibility to comply with that order and to maintain any devices that are placed at the crossing pursuant to the order. But they do not have any responsibility to make the decision as to what types of devices should be placed at the crossing, nor do they have any responsibility to petition the Congress Commission to do so. This is a highway issue, and that's why the Congress has designated to each state, in this case the state of Illinois, using the Illinois Congress Commission, makes that decision. They're the, their responsibilities for the crossings in the state of Illinois, and they have the expertise in deciding what types of warning devices should be placed at this particular crossing based upon the criteria that exist at that given time. The record clearly establishes, in this case, that at the time of this accident, in November of 2006, Illinois Central Railroad was in complete, full compliance with the regulations and the orders of the Illinois Congress Commission. And the plaintiff is trying to impose a duty that doesn't exist, and this, again, has been previously addressed by the Illinois Supreme Court most recently in the Chandler case, which, although the issue is a little different, involved the exact same degree. So, for that reason, we would ask that the court, on the first question, that the preemption does exist, the answer is yes, and on the second question as to whether or not there is any legal duty by the Illinois Central to do any type of changes or petitioning to this crossing, the answer should be no. Thank you. Let me ask you a question. Sure. Did these actions and letters, petitions, whatever, that led to Mr. Speed's actions, did the railroad participate in any of those? No, they received copies. Pardon me? They received copies. Okay, so they had actual knowledge of it, but did not participate. That's correct. Okay. They received copies of the letter, and as the letter, you have copies of all these letters and the clerk reading of all the letters, and as Mr. Speed, when he responded to these, the language that he used in saying that these would be placed on a program, and that's the way he… communicated to Mr. Speed what Mr. Speed communicated to those people and was informed and stood mute. There really wasn't any proceedings. No, there wasn't a hearing or anything. But, yes, they had received copies of that communication. No question about that. Okay. Thank you. Any other questions? Thank you. Okay. Hmm. Okay, the police and the court. Thank you for turning off that fan. If it gets on, I'll turn it back on. Here's what I can hear, because I get this buzz in my ears as I get older. Mr. Jones and I are talking about a different case, I think. See, I'm talking about court, and I don't know that he's talking about the court, or I think he's talking about a different case than the court. What he's talking about, and with all due respect, I'd be talking about the same thing if I were him. What he's talking about is he's talking about all of these crossings, which are approved on a five-year plan. That's what he's talking about. That's the crossings that he's talking about. He's talking about all of these crossings. These are part of the record that began in C-118 and they go through C-149. These are crossings that are put on a five-year plan. Those crossings have not been inspected. They have not been subject to an ICC investigation. They are just placed on a five-year plan. It's a wish list. It is a funding wish list. That's what the status of this crossing was before this crossing became a different crossing than the crossings that Mr. Jones is talking about. This crossing became a different crossing when Costello wrote a letter to Steed and Steed dispatched ICC personnel with expertise to inspect that particular crossing and following that inspection of that particular crossing and after applying all of those things that the ICC in its expertise applies in making a judgment about a crossing, including the geometry, including the track configuration, including the traffic, including the highway traffic, including the school traffic, including the speed of the trains, including the directions of the trains, including the sight distances. They did that as to this crossing. This is a different crossing than the crossing that Mr. Jones would say the law applies to. I agree with Mr. Jones about how he says the law applies. He is correct. As to all of these crossings where there has not been ICC inspection and investigation, you are correct. There must be an order, and that order occurs ironically after what? After the ICC applies its expertise, inspects the crossing, investigates the crossing, has a hearing, and then an order occurs. But this case is unique. This, I am not suggesting that this court under any circumstances needs to make any law. There is no new law to be made here. This case and the decision that I urge this court to reach would require the court to do nothing more than to follow the law as it exists. It's ironic that I and Mr. Jones are in agreement as to the statute that applies. It is ironic that I and Mr. Jones are in agreement as to the applicability of Espinosa and Chandler. I think Espinosa and Chandler require that this case be treated differently from all of these other cases because there has been intervention and expertise exercised by the ICC. May I say the following? This is all we're talking about right here with the police and the court. One word. Presumption. This is it. We are talking about nothing more than a presumption. The railroad wants a presumption. Essentially what they want this court to do is they want this court to presume that a crossing with the ICC, because of a congressional inquiry, it was a unique circumstance, determined was unsafe and determined that it required a case. They want you to presume that that which the ICC said isn't true until you go through some kind of a formal funding process. And that's all the order is. The order is funding. The order, the five-year wish list plan, it costs $145,000 to do one of these. They could have spent the $145,000 and at which point they could have gotten reimbursed, but instead what they do is they wait on the five-year plan because then what happens? The state and the feds pay 85% of the cost, the village pays 10% of the cost, and the railroad pays 5% of the cost. The order is a funding mechanism. The word order appears nowhere in either the statute and more importantly it appears nowhere in Espinoza and more importantly it appears nowhere in Chamberlain. What those cases all talk about is they all embrace one significant proposition of law, and that proposition of law is clear and unequivocal. It is that the state of Illinois and the legislature has said we are going to defer to the expertise of the ICC. We are going to defer to their expertise because this is what they do. And if in the exercise of their expertise, following an inspection and following an investigation, they determine that a crossing and the protection of that crossing is adequate, then we will presume it is adequate. Does that mean that every crossing in this state which only has flashing lights is safe? No, it doesn't. Let me give you an example. The one in Marissa wasn't safe because it killed a woman, two kids, and badly injured a third kid because a train was coming straight out of the east, straight out of the sun. You can't see it, it's going 55 miles an hour, right in the morning on the way to school, three kids in the car, killed. That's not a safe crossing. Is it presumed to be safe? It would have been presumed to be safe, except for one thing. The ICC inspected this crossing. Why did this crossing get inspected? Because the village in Marissa had been trying for years to get this crossing. It goes right through the middle of town. It's Main Street. And the trains come through at 55 miles an hour. And in the morning they come out of the east. And there's a blinding sun. And kids, this is a route people take to school. The ICC, when they looked at this and said they had been trying for years, the village in Marissa finally managed to get on the five-year program. Now this is where Mr. Jones and I have a disagreement about the facts. They were on the five-year program. When they got on that five-year program in the spring of 2005, that's fine because but for what happened after they got on this five-year program, I wouldn't be here. Because he'd be wrong. Because they'd be on a five-year program, and there would have been no evidence, any expertise exercised by the commission to determine if this wasn't a fair case. But something happened after they got on this program. You know what happened? They petitioned. They petitioned in Marissa and said, you cannot petition the Lord with prayer. But of course you can petition your country. And so 180 citizens signed a petition. And because they couldn't get no help from the ICC between the years 2000 and 2005, the speed of the trains, that crossing, all that was to him in advance. Obviously records show that crossing. What they then do at that point is they petition their congressman. The congressman writes a letter. And the congressman writes a letter to the ICC. And the ICC then says at that point, it's as he says, quote, and this is, remember, this was in June of 2005. June of 2005. They were placed on this list in April of 2005. At that point, no treatment. June of 2005, the congressman writes a letter. And then at that point, what do you think the ICC did? This is a congressman. So what do you think they did? They sent out Joe Vandenberg, the guy with the expertise, the engineer. He went out and he inspected that particular crossing. And when he inspected that crossing, he decided that it required, required, because he wrote and he told his boss, Steve, this crossing requires gates. And he sent that and they communicated that to Steve. And then Steve interned. And that was in the exercise of the ICC expertise. And then Steve at that point said, quote, quote, he then wrote the letter, Your Honor. He wrote the letter. He wrote the letter to Congressman Costello and he copied the railroad. He also, so that there's no misunderstanding about the railroad's ability to participate. The railroad knew before Steve sent Vandenberg out there to look at this particular crossing, the railroad knew that the inspection was going to occur because they were copying it on that level. The letter that went from Steve back to Costello said, we're going to go look at this crossing, Congressman. And so they went and they looked at the crossing. And then at that point they wrote back and they said, this crossing meets the requirements for gates. This crossing. Only this crossing. Now, let's talk about this. This crossing was approved. We want to talk about order and approval. The word is approval. They want to keep talking about order. Order are for funding mechanisms. And so what made this crossing different was that inspection and the exercise of that expertise. Now, let's make sure that there's no misunderstanding. It's only this crossing. And what did this crossing lose? All it lost was a presumption. We are not here to ask you that you presume that this crossing should have had gates. We are merely here to ask you that in this particular case, under these unique facts involving this particular crossing, that the railroad be deprived of their presumption. Let a jury decide whether or not this particular crossing, this particular crossing should have gates. Because there is no question, regardless of the presumptions and regardless of all of the protections that the railroad has, mainly through the legislature and through the ICC, there is still no question that there is a duty on the part of the railroad to maintain the crossing. Now, let a jury decide whether reasonable care requires gates. All we say is, we're going to make a presumption here because they weren't told. They were told that it required gates. Now, let's be very clear about something. Mr. Jones keeps wanting to talk about order. That statute, you go find me where the statute says order. You find me where Espinosa Channel ever uses the word order. But let's talk about what, in fact, Mr. Steeve testified to. He said, well, Mr. Steeve is only an administrator. Mr. Steeve is the ICC. If there was someone else, I could propose to the ICC. I'm sure Mr. Jones would say, try this guy. He's the last. Mr. Steeve said it. I said to him, and this is in the record. It appears at page C-58. I wrote that as part of the question. Mr. Steeve, the letter that you wrote to Jerry Costello, you had written that after a representative from your office, Joe Vandenberg, conducted an inspection of this crossing. And you were telling Congressman Costello that the ICC, following an inspection and evaluating those factors which you and I have discussed, including the type of train traffic, the vehicle traffic, site restrictions, previous collisions, geometry of the crossing, there had been a determination made by the ICC, in an exercise of its expertise and discretion, that you believe that this crossing required a true answer. Yes, he didn't say it once. Congressman Costello said it three times. He said it a lot of times. He answered the same question again on page C-60. And then this was a very telling question. Because this isn't about – talk about you have a duty petition. No, the petition is nothing more than a ministerial act. Because I asked him. I said, and as of that date, when the commission had told the railroad, August, August the 15th of 2005, 15 months before these people were killed, 15 months before they were killed, it said, as of that date, when the commission had told the railroad, as well as the mayor and the congressman, that in the exercise of your expertise and discretion, you had determined this crossing required gates, my question is, other than access to funding from the Great Crossing Protection Fund, in other words, the money, what would have stopped the railroad from going forward and installing gates at the crossing line 7? Nothing. Nothing. That's from my receipt. You got a different way of telling me what it is? Because there isn't. And make no mistake about it. It's just that, let's talk about what the law is. Because what the law is, is that the law is what we talk about when we look at espionage. This is the statute that we're concerned about. The commission shall have the power, upon his own motion or upon complaint, and after having made proper investigation to require the installation of adequate or appropriate luminous reflective warning signs, lights, gates, illuminated at night, luminous flashing signals at crossing gate devices installed at the Great Crossing, which have been approved by the commission, shall we deem adequate and appropriate. That's what the commission did on this crossing. Not all these other crossings. This crossing. And the exercise, and following the investigation, they said, you should have gates. I'm not saying, I'm not saying that the jury should be instructed there must be gates. I'm just saying, they've got a duty of reasonable care. They shouldn't get a presumption in this case and on these facts. And so, with that thought in mind, what did the Supreme Court interpret in espionage of that language? I haven't seen or heard the report yet. We interpret the relevant language in this section as providing that once the commission has investigated a crossing and has approved the installation of a luminous flashing signal or crossing gate device, that the installation of that device shall be deemed adequate and appropriate, a conclusive legal presumption is created, which prevents punishments from arguing that there should have been more. Well, guess what? If it's good for the goose, why can't it be good for the gander? Because most of the time, it is the railroad who is on the good side of this presumption. They just happen to have a set of facts for when they're on the wrong side of this presumption. Because in this case, the ICC did investigate this crossing, and the railroad was told by a letter in August that this crossing required gates. There's no misunderstanding. August 15, the representative of this office recently inspected the subject crossing and determined the existing conditions meet the conditions minimum requirements for the installation of automatic gates. And Mr. Jones, I agree with you. He cites to you this change that occurred on December 15, 2005. I love that, because it came after this. They were told in June or whatever, well, August, that you must have gates. And then Patrick Hedges says in December that there's a new administrative regulation that comes out that says all the lawful existing crossings are hereby approved by the law. This one, this was predated. This was 4-1-0. I don't know about this. But this particular letter predated this particular regulation, and he says, Chandler, I find it remarkable that we both rely so heavily on Chandler. I think Chandler is instructive, and I think it's quite, frankly, I just think it's extraordinarily persuasive. Because in Chandler, the following language appears, 708 Northeastern, Section 732. Quote, there is no, and this is important, because who petitioned in this case? On behalf of the citizens. Who petitioned back in 1962 to remove the gates? The railroad. That's fine. Everybody gets a petition. And it says here, the Supreme Court says, there is no principal reason to distinguish between the instances where the commission approved the warning devices following investigation, whether the proceedings were initiated by the commission, the railroad, a municipality, or a private individual. Second, as noted in Espinoza, the conclusive legal presumption applies, quote, to any commission investigation and approved. The word order does not appear. They investigated, and they approved. Again, we're only talking about in one case taking a legal presumption, let the jury decide whether or not in 15 months the exercise of reasonable care would have required something different there. May I continue? It goes on to say, quote, it is not limited to instances where the commission requires the installation of warning devices at a crossing, as opposed to instances where the commission approved existing warning devices. There is no principal reason for the distinction. The commission undertakes the same investigation and is motivated by the same safety concerns, whether it enters in order in a proceeding initiated by a railroad or by another entity, and whether it approves existing warning devices or warning devices which are in place at a crossing. That's what it is. We have made a decision in the state of Illinois with the legislature, and the Supreme Court has validated that decision, not once, but twice. And that's because at the end of the day, it's just that we are going to defer to expertise. You know what? I don't care. It's not my problem. You know, we review common cases, and we defer to the expertise of the commission. In this instance, it's just that the statute and the policy and the principles of the law, it's just that we defer to their expertise. Does it mean all of those crossings are safe? I'll guarantee you there's crossings out there at required gates. But unfortunately for those crossings, they're probably just on a five-year plan. And unfortunately for those crossings, if I did not have the intervention of a congressman, 180 concerned citizens from Marissa, and most importantly, an ICC who responded to this petition and sent an expert out there to exercise their concerns. This is about safety. This isn't about, gotcha, gotcha, don't have it on, gotcha. We get to hide the fact you don't have it on, gotcha. These people don't get their day in court. No, it isn't. It's about safety. And what safety is, it's the job of the ICC. And the ICC did this job. And they reached a conclusion. And they told the world in August of 2005 what that conclusion was. And it was a presumption. I'm not saying it. We have, in the state of Illinois, a common law duty. You have a common law duty to maintain the railroad crossing in a reasonable state of the nation, and that includes a reasonable state of the state crossing. We have a presumption in the state of Illinois that says that the ICC has approved, inspected, and approved your crossing. And the protection that we presume is added may not be a presumption. That's not always fair. But in a circumstance such as this, when we have that presumption, that presumption can disappear if the rationality behind the presumption is not to think about this. To give the railroad what they want in this case, which is their presumption, you will be essentially saying the ICC looked at this crossing. The ICC determined that this particular crossing was vacant. We are going to say to you, you don't get to have a case. You don't even get a court of adjournment because we're going to presume they didn't move gates. The ICC is going to do this. It's crazy. Thank you so much. Yeah. As I anticipated and as I told you before, Planner's Council is arguing over and over again that Michael Steed is the commission and he is not the commission. And every regulation that he cites and what he's read to you, even from the Chandler case, read that. And it talks about the commission. And Mr. Steed is not the commission. Mr. Steed wants to, excuse me, Mr. Keith wants to cite to Mr. Steed's testimony, which we've actually cited in the record. Steed testified that he is not the commission and he cannot order the installation of gates. That's in the record. Mr. Steed is an administrator in the rail section. He can make recommendations. Just like all three of you, you have law clerks. Your law clerks, you might ask to do some research, and they might make a recommendation to you as to how a case should be decided. And let's say that gets out in the open, that somehow the law clerk talks about that. Does that mean what the law clerk said is the order? Absolutely not. We have statutory constitutional issues here. The constitutional issue with you are the court. You make the decision, regardless of whether you disagree or not with your law clerk. The bottom line in this case is, regardless of what Mr. Steed recommends, the commission is required to enter the order before, and that is the regulatory scheme. That is what's spelled out over and over in the statute. And what Mr. Keefe talks about, this is about safety. Now, just in hindsight, just think about that statement for a minute. If this was somehow that the Commerce Commission, which they hadn't decided this because it was never brought to the Commerce Commission, but if Mr. Steed felt that this was something unsafe, why would he place this on a program for 2009? As a matter of fact, if you read his letter, he says, this person already has flashing lights at the crossing, and so this case is not a priority for us to make or recommend any changes. Mr. Keefe pulls out this plan, and he shakes it, and one of the exhibits, look at the bottom, as far as this particular crossing, there's a footnote, and it says, these are only proposed changes for a crossing in the future because they have not been submitted or ordered by the commission. That's important because, of course, that's the whole scheme. So this is an issue that the plaintiff is trying to impose upon the duty of the railroad that they have to go out and do something before the commission orders it. As I indicated, once the commission orders it, as they did in this case, even though it's after the fact, you see in the record here that after the accident, again, it took an order from the commission. The commission had to make an order to have this crossing changed after the accident. As a fact, that order, even though this accident happened in November 20 of 2006, that order didn't even take place until several months later in 2007 because it's required by the provision. It's required by the law. Mr. Keefe wants to argue, you know, impassionably, this is an unfortunate accident. Illinois Central doesn't want to be involved in accidents either, but Illinois Central has complied with the law, and now they're trying to impose upon Illinois Central an obligation to do something that is not their responsibility or duty. Mr. Keefe talks about that somehow the absence of gates at this crossing, which is what he wants to argue to a jury, that somehow the absence of gates caused this unfortunate accident. The sad reality, and it's in the records in the Illinois Commerce Commission. They publish it every year. Do you know that about 75% of all highway, railroad, and break crossings in the state of Illinois occur at crossings that are equipped with flashing lights or flashing lights and gates? It doesn't mean that that's going to solve all the problems, but that's really not the issue here. The issue that is before the court here is for you to decide based upon the law. I mean, that is your role to decide based upon the law, based upon not only the statutory scheme, but the previous law that comes before you, which is the Chandler case and the Espinosa case, and the cases that we've cited to you, clearly establish that this is an issue that the legislature, even when they pass that provision, and we even have the legislative history in there, may want to prevent the railroad from being imposed to have this duty. My time's up if there's no questions. Thank you. Thank you, fellas. Enjoy your case. Thank you very much. Thank you.